**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

BRYAN PATRICK FAUR,

   Plaintiff,

vs.

CHICAGO CENTRAL & PACIFIC
RAILROAD COMPANY,

   Defendant.

No. 17-CV-2040-LRR

**ORDER**

_____

*TABLE OF CONTENTS*

*I. INTRODUCTION. ............................................................................1*
*II. RELEVANT PROCEDURAL HISTORY..............................................2*
*III. SUBJECT MATTER JURISDICTION..................................................2*
*IV. SUMMARY JUDGMENT STANDARD..................................................3*
*V. RELEVANT FACTUAL BACKGROUND..............................................4*
  *A. Parties..................................................................................4*
  *B. Overview of the Dispute........................................................4*
*VI. ANALYSIS.........................................................................................8*
  *A. Parties' Arguments...............................................................8*
  *B. Applicable Law.....................................................................9*
  *C. Application..........................................................................10*
    *1. Faur's reasonable accommodation claim.................10*
    *2. Qualified individual..................................................11*
*VII. CONCLUSION.................................................................................18*

*I. INTRODUCTION*

  The matters before the court are Defendant Chicago Central & Pacific Railroad Company's ("CCP") "Motion for Summary Judgment" ("CCP Motion") (docket no. 20) and Plaintiff Bryan Patrick Faur's "Motion for Partial Summary Judgment" ("Faur

Motion") (docket no. 22).

## II. RELEVANT PROCEDURAL HISTORY

On June 12, 2017, Faur filed a "Petition and Jury Demand" ("Petition") (docket no. 3) in the Iowa District Court for Black Hawk County. In the Petition, Faur alleges that CCP violated his rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(a), and the Iowa Civil Rights Act ("ICRA"), Iowa Code section 216.6. *See* Petition ¶ 62. On July 21, 2017, CCP filed a Notice of Removal (docket no. 1), bringing the case before the court.

On July 28, 2017, CCP filed a Motion to Dismiss (docket no. 4). On March 7, 2018, the court granted in part and denied in part CCP's Motion to Dismiss. *See* March 7, 2018 Order (docket no. 18). The court dismissed with prejudice Faur's claim "to the extent it [was] predicated on his requests for a day-shift conductor assignment or transfer to the [Maintenance of Way ("MOW")] Division." *Id*. at 12. On June 5, 2018, CCP filed an Answer and Affirmative Defenses (docket no. 19).

On July 16, 2018, CCP filed the CCP Motion. On the same date, Faur filed the Faur Motion. On August 6, 2018, Faur filed a Resistance to the CCP Motion ("Faur Resistance") (docket no. 27). On the same date, CCP filed a Resistance to the Faur Motion ("CCP Resistance") (docket no. 29). On August 13, 2018, Faur filed a Reply to the CCP Resistance ("Faur Reply") (docket no. 30). On the same date, CCP filed a Reply to the Faur Resistance ("CCP Reply") (docket no. 32). Neither party has requested oral argument, and the court finds that oral argument is unnecessary. The matter is fully submitted and ready for decision.

## III. SUBJECT MATTER JURISDICTION

The court has original jurisdiction over Faur's claim arising under the ADA. *See* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."). The court has

supplemental jurisdiction over Faur's claim arising under the ICRA because it is so related to the claim within the court's original jurisdiction that they form part of the same case or controversy. *See* 28 U.S.C. § 1367(a) ("[T]he district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy. . . .").

## IV. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is proper 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show'" an absence of a genuine dispute as to a material fact. *Hilde v. City of Eveleth*, 777 F.3d 998, 1003 (8th Cir. 2015) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc)). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Massey-Diez v. Univ. of Iowa Cmty. Med. Servs., Inc.*, 826 F.3d 1149, 1157 (8th Cir. 2016) (quoting *Gazal v. Boehringer Ingelheim Pharm., Inc.*, 647 F.3d 833, 837-38 (8th Cir. 2011)). "The movant 'bears the initial responsibility of informing the district court of the basis for its motion,' and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" *Torgerson*, 643 F.3d at 1042 (alterations in original) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once the movant has done so, "the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex Corp.*, 477 U.S. at 324).

On a motion for summary judgment, the court must view the facts "in the light most favorable to the nonmoving party." *Id.* (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)). "Where the record taken as a whole could not lead a rational trier of fact to

3

find for the nonmoving party, there is no genuine issue for trial," and summary judgment is appropriate. *Ricci*, 557 U.S. at 586 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "The nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts' . . . ." *Torgerson*, 643 F.3d at 1042 (quoting *Matsushita*, 475 U.S. at 586). Instead, "[t]o survive a motion for summary judgment, the nonmoving party must substantiate [its] allegations with sufficient probative evidence [that] would permit a finding in [its] favor based on more than mere speculation, conjecture, or fantasy." *Williams v. Mannis*, 889 F.3d 926, 931 (8th Cir. 2018) (third alteration in original) (quoting *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 801 (8th Cir. 2011)). Mere "self-serving allegations and denials are insufficient to create a genuine issue of material fact." *Anuforo v. Comm'r of Internal Revenue*, 614 F.3d 799, 807 (8th Cir. 2010). "Evidence, not contentions, avoids summary judgment." *Reasonover v. St. Louis Cty.*, 447 F.3d 569, 578 (8th Cir. 2006) (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 809 (8th Cir. 2003)).

## V. RELEVANT FACTUAL BACKGROUND

Viewing the evidence in the light most favorable to the nonmoving parties, and affording them all reasonable inferences, the uncontested material facts are as follows.

### A. Parties

Faur is a resident of Clinton County, Iowa. *See* Statement of Undisputed Material Facts in Support of Faur Motion ("Faur SUMF") (docket no. 22-2) ¶ 1; Petition ¶ 1. CCP is a Delaware corporation and rail carrier that operates primarily in Iowa. *See* Statement of Undisputed Material Facts in Support of CCP Motion ("CCP SUMF") (docket no. 26-1) ¶ 1; Petition ¶ 2.

### B. Overview of the Dispute

In May 2012, CCP hired Faur as a conductor. CCP SUMF ¶ 4. In early 2013, Faur was feeling "[t]ired, irritable, depressed, weak . . . [and] rundown." Appendix in

Support of CCP Motion ("CCP Appendix") (docket nos. 20-3 through 20-5)[1] at 10; CCP SUMF ¶ 5. Faur further stated that he "couldn't get to sleep." CCP Appendix at 10; CCP SUMF ¶ 5. On February 19, 2013, Faur had a fainting episode while on the job. CCP SUMF ¶ 5.

On February 27, 2013, Dr. Ronald Sims, M.D., diagnosed Faur with restless leg syndrome, periodic limb movement disorder and insomnia. *Id*. ¶ 6; Faur SUMF ¶ 9. Dr. Sims filled out a medical status report ("MSR") form for CCP. CCP SUMF ¶ 7. On the form, Dr. Sims restricted Faur from driving a motor vehicle (if drowsy), climbing to heights on a ladder, operating any heavy machinery or equipment and operating tools such as electric drills and electric saws. *Id*.; Supplemental Appendix in Support of CCP Motion ("CCP Supplemental Appendix") (docket no. 26-2) at 2. Dr. Sims also restricted Faur to "work[ing] in [the] daytime only." CCP Supplemental Appendix at 2; CCP SUMF ¶ 7. Further, on February 27, 2013, CCP granted Faur a paid medical leave of absence from his conductor position. CCP SUMF ¶ 8.

On March 13, 2013, Faur had a follow-up appointment with Dr. Sims. *Id*. ¶ 10. Dr. Sims completed a second MSR form and imposed the same work restrictions as the first MSR form, including that Faur's "work period must be in daytime only." CCP Supplemental Appendix at 3; CCP SUMF ¶ 10. Over the next year and nine months, Dr. Sims continued to treat Faur for his medical conditions. CCP SUMF ¶ 11. During this time, Dr. Sims completed multiple MSR forms imposing the same work restrictions on Faur. *Id*.; CCP Supplemental Appendix at 4-11. Throughout that time period, Faur requested extensions of his leave of absence, which CCP always granted. CCP SUMF ¶ 12.

---

[1] CCP has filed its Appendix in Support of CCP Motion in three consecutively paginated parts. The court shall refer to such consecutive pagination when citing to the CCP Appendix in this Order.

On May 8, 2014, Faur received a letter from his insurance carrier informing him that his short-term disability benefits would expire on December 16, 2014. *Id*. ¶ 13. On November 5, 2014, Faur contacted Vicki LaForte, CCP's Leave Administrator, and expressed interest in returning to work. *Id*. ¶ 14. Faur acknowledged that he could not work as a conductor due to his work restrictions, but expressed interest in a MOW position. *Id*. LaForte asked Faur to obtain an updated MSR form from his medical provider. *Id*. ¶ 15. On November 11, 2014, LaForte received a note from Dr. Sims which stated that, "so long as . . . Faur is working on the day shift, he is able to drive, clim[b] ladders, operate heavy machinery and use tools." CCP Appendix at 186; CCP SUMF ¶ 16.

Faur began communicating with Patrick Crain, CCP's Human Resources Manager, regarding his interest in obtaining a different position with CCP. CCP SUMF ¶¶ 17-19. On February 6, 2015, Faur emailed Crain, that his "work restrictions are limited to daytime hours." CCP Appendix at 85; CCP SUMF ¶ 20. On March 3, 2015, Crain emailed Faur to inform him that a rail track maintainer ("RTM") position was opening in Waterloo, Iowa, in the next twenty-four hours. CCP SUMF ¶ 23. Faur applied for the open RTM position on March 4, 2015. *Id*.

The job description for the RTM position stated that RTM workers maintain the railroad's tracks by "inspecting, repairing and replacing rails, ties, switches and ballasts." CCP Appendix at 88; CCP SUMF ¶ 24. The RTM job description described the working conditions as "shift work, as well as work away from home on various work cycles and occasional overtime." CCP Appendix at 88; CCP SUMF ¶ 28. An informational form for RTM applicants provided that working hours "vary with variable starting times in the morning" that are "[g]enerally [eight] hours over [five] days," but with "[s]chedule flexibility . . . required per [the] collective bargaining agreement." CCP Appendix at 83; CCP SUMF ¶ 27.

6

RTM workers are members of the Brotherhood of Maintenance of Way Employees Union ("BMWE"). CCP SUMF ¶ 30. The terms of employment for RTM workers are governed by a collective bargaining agreement ("CBA") between BMWE and CCP. *Id*. With respect to RTM working hours, under the CBA, the start time can be as early as 4:00 a.m., with required overtime before or following a regularly-scheduled shift. *Id*. ¶¶ 34-35.

Labor Relations Manager Melissa Fountain, who negotiates and administers the CBA between CCP and BMWE, and is familiar with the job requirements of the RTM position, stated that, RTM workers are "commonly called for duty outside of their regular working hours and not continuous with their regular hours, including nighttime calls for duty." CCP Appendix at 240. Fountain further stated that "[a]vailability for call outs at unpredictable hours is an essential function of the RTM position" and "RTMs must be available to respond to emergencies such as derailments or weather events" which "occur at unpredictable and uncontrollable hours." *Id*.

After learning that Faur applied for the RTM position, Crain directed Marie Penuel, a CCP human resources associate, to include Faur among the applicants selected to be interviewed. CCP SUMF ¶ 52. Crain did not inform Penuel that Faur was restricted to working a daytime shift. *Id*.

On March 16, 2015, Faur interviewed for the RTM position with Penuel and Jeffrey Pratt, an engineering manager. *Id*. ¶ 53. Penuel asked Faur why he was interested in the RTM position, and Faur responded that he needed a "steadier schedule." *Id*. ¶ 54. Pratt explained that the RTM position required availability for "random calls" at irregular hours, including at 1:00 a.m. *Id*. ¶ 55. Pratt told Faur that he would need to be available to work "nights, weekends, holidays, [and] birthdays." *Id*. (alteration in original); CCP Appendix at 216. Shortly thereafter, the interview ended. The parties disagree whether Faur ended the interview because he indicated he was unable to work such a schedule or

whether Penuel ended the interview.  *Compare* CCP SUMF ¶ 56, *with* Faur SUMF ¶ 57.

On March 31, 2015, CCP informed Faur that he had not been selected for the RTM position.  CCP SUMF ¶ 60.

On April 29, 2015, Faur applied for an RTM position with the Illinois Central Railroad Company out of Gilman, Illinois.[2]  *Id*. ¶ 62.  CCP informed Faur that he met the online criteria for the position.  Faur SUMF ¶ 87.  Faur's application was forwarded to Dan Kelley, the hiring manager, but Faur was not selected for an interview.  CCP SUMF ¶ 64.

On May 8, 2015, Faur submitted a resignation letter, effective May 21, 2015.  *Id*. ¶ 63; CCP Appendix at 114.  Faur had secured alternative employment with Bill Whitters Construction Company.  CCP SUMF ¶ 63.  After resigning his employment with CCP, Faur did not seek any further medical treatment for his sleeping disorders.  *Id*. ¶ 78.  Faur also stopped taking his prescribed medication.  *Id*. ¶ 79.  Faur stated that, by the end of 2015, he was sleeping regularly.  Appendix in Support of Faur Motion ("Faur Appendix") (docket nos. 23-1 through 23-9)[3] at 171.

## VI. ANALYSIS

### A. Parties' Arguments

Faur argues that he is entitled to summary judgment for two reasons.  First, Faur argues that CCP "failed to reasonably accommodate" his disability by reassigning him to an open RTM position.  *See generally* Brief in Support of Faur Motion (docket no. 22-1) at 10-18.  Specifically, with regard to his reasonable accommodation claim, Faur argues that CCP's "refusal to consider exempting [him] from potential midnight call[-]outs or

---

[2] Illinois Central Railroad Company and CCP are related entities through parent company, Canadian National Railway Company.  *See* Faur SUMF ¶¶ 2-3.

[3] Faur has filed his Appendix in Support of Faur Motion in nine consecutively paginated parts.  The court shall refer to such consecutive pagination when citing to the Faur Appendix in this Order.

8

even allowing him to work around the call[-]outs" and failure "to engage in the interactive process" constitute violations of the ADA and the ICRA. *Id*. at 11-18. Second, Faur argues that CCP's "refusal to consider or place [him] in one of the Waterloo [RTM] positions or the Gilman position amounts to an adverse job action based on his disability." *Id*. at 18.

CCP argues that it is entitled to summary judgment on Faur's disability discrimination claims because Faur is not a qualified individual under the ADA or the ICRA. *See* Brief in Support of CCP Motion (docket no. 26) at 19. Specifically, CCP argues that "Faur's inability to perform an essential function of the RTM position—working variable hours, including nighttime hours—is fatal to his claim." *Id*. at 10.

### *B. Applicable Law*

The ADA makes it unlawful for a covered entity to "discriminate against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Discrimination in this context includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee." 42 U.S.C. § 12112(b)(5)(A). "As the statutory language indicates, ADA protection extends only to a qualified individual with a disability, namely, 'an individual with a disability who, with or without reasonable accommodation, . . . can perform the essential functions of the employment position that such individual holds or desires.'" *Peyton v. Fred's Stores of Ark., Inc.*, 561 F.3d 900, 902 (8th Cir. 2009) (alteration omitted) (quoting 42 U.S.C. § 12111(8)). The ICRA makes it unlawful for any person to "discriminate in employment against . . . any employee because of the . . . disability of such . . . employee." Iowa Code § 216.6(1)(a). As a general matter, "ADA and ICRA disability discrimination

9

claims are analyzed in the same fashion." *Faidley v. United Parcel Serv. of Am., Inc.*, 889 F.3d 933, 940 (8th Cir. 2018) (en banc); *see also Kallail v. Alliant Energy Corp. Servs., Inc.*, 691 F.3d 925, 930 (8th Cir. 2012) (noting that "[d]isability claims under the ICRA are generally analyzed in accord with the ADA" (quoting *Gretillat v. Care Initiatives*, 481 F.3d 649, 652 (8th Cir. 2007))). Therefore, the court shall analyze both Faur's ADA and ICRA disability discrimination claims under federal law.

In order "[t]o establish a prima facie case of discrimination under the ADA, [Faur] must show that he '(1) is disabled within the meaning of the ADA, (2) is a qualified individual under the ADA, and (3) suffered an adverse employment decision because of the disability.'" *Faidley*, 889 F.3d at 940 (quoting *Kallail*, 691 F.3d at 930). "Disability" is defined by the ADA as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1)(A)-(C). A person is a "qualified individual" under the ADA, if he or she "satisfies the requisite skill, experience, education, and other job-related requirements, and 'can perform the essential job functions, with or without reasonable accommodation.'" *Rehrs v. Iams Co.*, 486 F.3d 353, 356 (8th Cir. 2007) (quoting *Cravens v. Blue Cross & Blue Shield of Kan. City*, 214 F.3d 1011, 1016 (8th Cir. 2000)).

### *C. Application*

#### *1. Faur's reasonable accommodation claim*

The court previously dismissed Faur's claim that CCP "failed to reasonably accommodate" his disability by reassigning him to an open RTM position. *See generally* March 7, 2018 Order at 9-10. The court stated in relevant part:

> Having reviewed the MOW CBA, the court finds that Faur's claim, to the extent it is predicated on the denial of his request to transfer to the MOW Division, would require the court to interpret and apply provisions of the collective bargaining agreement. The MOW CBA sets forth specific procedures for

10

> posting open or new positions to allow for internal applications. [CCP] could not transfer Faur into an open or new position in the MOW Division without potentially violating these terms. Thus, Faur's claim is preempted by the RLA.
>
> Accordingly, the court shall grant the Motion [to Dismiss] to the extent that Faur's disability discrimination claim is predicated on his request to be transferred to the MOW Division.

*Id*. at 10 (citation omitted). Here, Faur's reasonable accommodation claim is predicated on CCP's failure to reassign him to an open RTM position within the MOW Division. *See generally* Brief in Support of Faur Motion at 10-18. Due to the MOW CBA, this claim is preempted by the RLA, and therefore, the court shall not consider it. Further, to the extent that Faur claims that CCP failed to engage in the interactive process by failing to accommodate him by transferring him to an open RTM position within the MOW Division, such a claim is also preempted by the RLA and the court shall not consider it. *See id*. at 16-17.

### 2. *Qualified individual*

In order to establish disability discrimination under the ADA, Faur must make a facial showing that he is a "qualified individual" under the ADA. *See Faidley*, 889 F.3d at 940. A person is a "qualified individual" under the ADA, if he or she "(1) possess[es] the requisite skill, education, experience, and training for [his or her] position; and (2) [is] able to perform the essential job functions, with or without reasonable accommodation." *Scruggs v. Pulaski Cty.*, 817 F.3d 1087, 1092 (8th Cir. 2016) (quoting *Hill v. Walker*, 737 F.3d 1209, 2016 (8th Cir. 2013)).

Here, CCP does not appear to dispute that Faur possessed the requisite "skill, education, experience, and training," necessary to perform the RTM position. CCP asserts, however, that Faur was unable "to perform an essential function of the RTM

position." Brief in Support of CCP Motion at 10. Essential job functions are the fundamental job duties of an employment position, but do not include the marginal functions of the position. *See Canny v. Dr. Pepper/Seven-Up Bottling Grp., Inc.*, 439 F.3d 894, 900 (8th Cir. 2006). The types of evidence a court should consider in determining whether a function is essential includes:

> (1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; (5) the terms of a collective bargaining agreement; (6) the work experience of past incumbents in the job; and (7) the current work experience of incumbents in similar jobs.

*Rehrs*, 486 F.3d at 356. "The employer's judgment about an essential job function 'is considered highly probative.'" *Knutson v. Schwan's Home Serv., Inc.*, 711 F.3d 911, 914 (8th Cir. 2013) (quoting *Duello v. Buchanan Cty. Bd. of Supervisors*, 628 F.3d 968, 972 (8th Cir. 2010)).

CCP argues that Faur is not a "qualified individual" within the meaning of the ADA because he is unable to perform an essential function of the RTM position, namely, having schedule flexibility, and working variable hours, including at night. *See* Brief in Support of CCP Motion at 14. Faur counters that the RTM position is "overwhelmingly dayshift" and occasional night work is not an essential function of the job. Brief in Support of Faur Motion at 13. Specifically, Faur asserts that the following evidence demonstrates that "the potential for getting called to work at night is not an essential function of the [RTM position] or at minimum could have been accommodated": (1) that CCP "keeps no records of time of day or night worked"; (2) "[s]ome crews did not work at night"; (3) testimony from Tyson Duff that, from August 2014 to June 2015, he worked as an RTM and did not get called out at night; (4) Faur's limited seniority made overtime unlikely; (5)

12

"[e]mployees who do not pick up their phones for night time calls are not disciplined"; (6) "[e]mployees are entitled to a certain number of unexcused absences and are not required to work when ill"; (7) that Faur, "if he had notice he would be called out, . . . could skip [his] nightly sleeping medicine"; and (8) CCP "regularly accommodates employees with temporary illnesses and other reasons to miss night work." *Id*. at 13-14.

The court shall first address Faur's contention that "the potential for getting called to work at night is not an essential function of the [RTM position] or at minimum could have been accommodated." *Id*. at 13. The evidence asserted by Faur in support of his argument is generally not relevant to the issue of whether schedule flexibility, variable work hours and nighttime work are essential functions of the RTM position. First, the fact that CCP does not keep records of the time of day or night that RTM employees work is neither an accommodation nor evidence that schedule flexibility, variable work hours and possible nighttime work hours are not essential functions of the RTM position.

Second, Faur's assertion that "some crews" do not work at night is based on (1) a generalization that "production crews work more consistently on the day shift than section crews," Faur SUMF ¶ 113; (2) alleged deposition testimony from Brandon Hutchinson, an RTM worker, where Hutchinson "recall[ed] being called to work on a weekend afternoon when he was assigned to a production crew," *id*. ¶ 114; and (3) deposition testimony from Tony Oldenburger, also an RTM worker, who stated that "[y]ou don't get call[-]outs when you're on night." Faur Appendix at 247; Faur SUMF ¶ 115. A generalization that production crews generally work day shifts as opposed to section crews is not evidence that the RTM position does not require schedule flexibility, variable work hours and nighttime work. Hutchinson's testimony was not that he recalled being called out on a weekend afternoon, but rather, that, while he was working on a production crew, he was called out "a couple times" at night. *See* Faur Appendix at 200. Finally, it is unclear how Oldenburger's testimony that "[y]ou don't get call[-]outs when you're on

13

night" is relevant to the requirement of schedule flexibility, variable work hours and nighttime work for the RTM position. *Id*. at 247.

Third, Duff's testimony that he did not get called out at night while working an RTM position during a ten-month period, is one individual's experience for a short period of time and does not negate CCP's requirement that RTM workers need to have schedule flexibility and be able to work variable hours, including nighttime work. *See Scruggs*, 817 F.3d at 1092 (rejecting argument that the ability to lift forty pounds was not an essential function of the job even if the plaintiff "did not often have to do it"); *Knutson*, 711 F.3d at 914-15 (rejecting plaintiff's argument that meeting DOT driving qualifications was not an essential function of the position because "he managed his depot successfully without driving a delivery truck"); *Dropinski v. Douglas Cty.*, 298 F.3d 704, 708-09 (8th Cir. 2002) (providing that, even though the plaintiff claimed to "never [have] performed" some of the job functions, those job functions remained essential because he "may [have] be[en] required" to perform them).

Fourth, even assuming that Faur's limited seniority would make overtime unlikely, this fact does not constitute a reasonable accommodation or refute that schedule flexibility, variable work hours and possible nighttime work are essential functions of the RTM position. *See Williams*, 889 F.3d at 931 ("To survive a motion for summary judgment, the nonmoving party must 'substantiate [its] allegations with sufficient probative evidence [that] would permit a finding in [its] favor based on more than mere speculation, conjecture, or fantasy.'" (second alteration in original) (quoting *Barber*, 656 F.3d at 801)). Fifth, even assuming that "[e]mployees who do not pick up their phones for night time calls are not disciplined,"[4] this also does not constitute a reasonable accommodation or refute that schedule flexibility, variable work hours and possible nighttime work are not essential functions of the RTM position. *See id*. Sixth, the fact that "[e]mployees are

---

[4] Brief in Support of Faur Motion at 14.

entitled to a certain number of unexcused absences and are not required to work when ill"[5] is wholly irrelevant to the issue of whether schedule flexibility, variable work hours and possible nighttime work are essential functions of the RTM position. *See Anuforo*, 614 F.3d at 807 (providing that "self-serving allegations and denials are insufficient to create a genuine issue of material fact.").

Seventh, Faur's claim that, if he had advance notice that he would be called out in the nighttime, he could skip his medication and work at night is not a reasonable accommodation. The point of schedule flexibility and variable work hours for the RTM position is that the timing of call-outs are unpredictable. *See* CCP Appendix at 240. Further, Faur's medical provider, Dr. Sims, restricted Faur to "work[ing] in [the] daytime only." CCP SUMF ¶ 7; CCP Supplemental Appendix at 2. "The ADA 'does not require an employer to permit an employee to perform a job function that the employee's physician has forbidden.'" *Otto v. City of Victoria*, 685 F.3d 755, 758 (8th Cir. 2012) (quoting *Alexander v. Northland Inn*, 321 F.3d 723, 727 (8th Cir. 2003)). Finally, the fact that CCP "regularly accommodates employees with temporary illnesses and other reasons to miss night work,"[6] is wholly irrelevant to the issue of whether schedule flexibility, variable work hours and possible nighttime work are essential functions of the RTM position. *See Anuforo*, 614 F.3d at 807.

Turning to the factors a court considers when determining whether a function is essential, the court finds that schedule flexibility, variable work hours, and possible nighttime work are essential functions of the RTM position. The first factor to consider is the employer's judgment as to the essential functions of the position. Here, Assistant Chief Engineer Dan Kelly testified that "the railroad is a [twenty-four]-hour operation with trains, and when we have an issue up and beyond our normal hours, we need people to

---

[5] *Id*.

[6] *Id*.

respond." CCP Appendix at 154. Labor Relations Manager Melissa Fountain, who negotiates and administers the CBA between CCP and BMWE and is familiar with the job requirements of the RTM position, stated that, "[RTM workers] are . . . commonly called for duty outside of their regular working hours and not continuous with their regular hours, including nighttime calls for duty." *Id*. at 240. Fountain further stated that "[a]vailability for call outs at unpredictable hours is an essential function of the RTM position" and "RTMs must be available to respond to emergencies such as derailments or weather events" which "occur at unpredictable and uncontrollable hours." *Id*.

A second factor to consider is the written job description. The RTM job description described the working conditions as "shift work, as well as work away from home on various work cycles and occasional overtime." *Id*. at 88. An informational form for RTM applicants provided that working hours "vary with variable starting times in the morning" that are "[g]enerally [eight] hours over [five] days," but with "[s]chedule flexibility . . . required per [the] collective bargaining agreement." *Id*. at 83.

A third factor to consider is the consequences of not requiring Faur to perform the essential functions of the job. Penuel testified that on small MOW crews, the limited availability of even one member "could absolutely cause an undue hardship on the railroad and stop any kind of work performance or productivity." Appendix in Support of CCP Resistance (docket no. 29-3) at 21.

A fourth factor to consider is the terms of a collective bargaining agreement. Here, the CBA provides that the start time for RTM workers can be as early as 4:00 a.m. with required overtime before or following a regularly-scheduled shift. *See* CCP SUMF ¶¶ 34-35.

Finally, a fifth factor to consider is the work experience of RTM incumbents. Hutchinson, an RTM worker, testified that, when working on a section crew, he got called back to work "[a]ll the time." CCP Appendix at 133. Hutchinson explained that he was

called back to work for "bad weather, like high wind, heavy rain, extreme heat, extreme cold; or it could be because of broken rails, [or] derailments." *Id*. Hutchinson further stated that there is "no set schedule with the railroad." *Id*. Oldenburger, another RTM worker, testified that, while on a section crew, he was called out after his regular working hours 100 to 120 times per year. *Id*. at 191. Oldenburger stated that he was called back for "snow removal or storm patrols or cutting trees or [for] broken rails." *Id*. Another RTM worker, Colten Maulding, stated that he primarily worked a day shift from 7:00 a.m. to 3:30 p.m., but sometimes "was required to continue working after [his] regularly-scheduled shift had ended." *Id*. at 236-37. Maulding further stated that sometimes he "worked more than four hours of overtime after 3:30 [p.m.] around ten times per year" and sometimes "worked more than six hours of overtime after 3:30 p.m." *Id*. at 237. According to Maulding, such overtime "work immediately after a shift was generally considered mandatory." *Id*. Maulding stated that "sometimes [he] was required to work at night and after dark." *Id*. Maulding further explained that:

> There were occasions when [he] was called back into work. Usually these call[-]backs were weather related and happened mostly December-February because of snow. Call[-]backs were rare during the other seasons and happened in the event of a derailment or other emergency. Occasionally, there might have been issues during the summer, like a tree being on the track.

*Id*. Maulding provided the following examples: "In winter of 2018, [he] was once called into work at 10[:00] p.m. on a Sunday and worked until 3:30 p.m. the next Monday. For four days during the summer of 2017, [he] worked a shift that started at 4:30 p.m." *Id*.

Having considered the factors outlined in *Rehrs*, the court finds that schedule flexibility, variable work hours and possible nighttime work are essential functions of the RTM position. 486 F.3d at 356. "It is not the province of the court to question the legitimate operation of a [railroad] or determine what is the most productive or efficient

17

shift schedule for a [railroad]." *Id*. at 358. Schedule flexibility, variable work hours and possible nighttime work are applicable to all RTM workers. Therefore, "[s]uch a generally applicable requirement [is] not discriminatory." *Id*. Furthermore, CCP was not required to create a daytime only shift for Faur. *Id*.; *see also Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 950 (8th Cir. 1999) (noting that a company is not "required to create a new position or to create a permanent position out of a temporary one as an accommodation"). Nor, was CCP required to eliminate an essential function of the RTM position to accommodate Faur. *Rehrs*, 486 F.3d at 359; *see also Kallail*, 691 F.3d at 932 ("While job restructuring is a possible accommodation under the ADA, an employer 'need not reallocate or eliminate the essential functions of a job to accommodate a disabled employee.'" (quoting *Fjellestad*, 188 F.3d at 950)).

Therefore, because Faur's restriction to work a daytime only shift rendered him unable to carry out the essential functions of the RTM position, and he did not make a facial showing that a reasonable accommodation was possible, the court finds that Faur was not a "qualified individual" under the ADA. Thus, Faur was not protected under the ADA, and CCP is entitled to summary judgment on Faur's claim of disability discrimination. *See Peyton*, 561 F.3d at 902 ("As the statutory language indicates, ADA protection extends only to a qualified individual with a disability, namely, 'an individual with a disability who, with or without reasonable accommodation, . . . can perform the essential functions of the employment position that such individual holds or desires.'" (quoting 42 U.S.C. § 12111(8))). Accordingly, the court shall grant the CCP Motion and deny the Faur Motion.

## VII. CONCLUSION

In light of the foregoing, CCP's Motion for Summary Judgment (docket no. 20) is **GRANTED** and Faur's Motion for Partial Summary Judgment (docket no. 22) is **DENIED**. The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendant

Chicago Central & Pacific Railroad Company and against Plaintiff Bryan Patrick Faur. The Clerk of Court is **DIRECTED** to terminate all outstanding motions and to **CLOSE THIS CASE**.

    **IT IS SO ORDERED.**

    **DATED** this 25th day of September, 2018.

*[Signature]*
LINDA R. READE, JUDGE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA